UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

HELEN DOLAN, in her capacity                    CIVIL ACTION
as natural tutrix for J.D.D.

VERSUS                                          NO: 12-2911

PARISH OF ST. TAMMANY, ET AL.                   SECTION: R

<u>**ORDER AND REASONS**</u>

On December 9, 2012, Helen Dolan filed this section 1983 civil rights suit on behalf of her minor son J.D.D. against St. Tammany Parish, Sheriff Rodney Strain, Washington Parish Sheriff Randy Seal, Tommie Sorrell, Damon Mitchell, Jason Mire, Walter Reed, and Ysonde Boland.[1] All defendants save Sheriff Strain have since been dismissed from the case.[2] Plaintiff's only remaining claim is that Strain subjected J.D.D. to unconstitutional conditions of confinement in the St. Tammany Parish Jail between July 27, 2012 and July 31, 2012.

Defendant now moves the Court for summary judgment on that claim pursuant to Federal Rule of Civil Procedure 56.[3] After due consideration, the Court finds that plaintiff has presented no evidence suggesting (1) that defendant was personally responsible

---

[1]     R. Doc. 1.

[2]     On June 26, 2013, the Court dismissed defendants Walter Reed, Ysonde Boland, and St. Tammany Parish from the case. R. Doc. 38. On January 20, the parties jointly stipulated to dismiss with prejudice all claims against Sheriff Seal, Sorrell, Mire, and Mitchell. R. Doc. 55.

[3]     R. Doc. 58.

for the alleged constitutional violations suffered by J.D.D., or (2) that St. Tammany Parish Jail had in place a general practice that led to those constitutional violations. Accordingly, the Court GRANTS defendant's motion and dismisses this case.

**I.   BACKGROUND**

This action arises out of the arrest, confinement, and prosecution of plaintiff Helen Dolan's seventeen year-old son, J.D.D. On July 25, 2012, deputies with the Washington Parish Sheriff's Office allegedly went to the Dolan home to place J.D.D. into custody pursuant to a warrant issued in connection with investigation into an alleged sexual battery.[4] The deputies allegedly took J.D.D. to the Bogalusa police station, interrogated him, and then obtained an arrest warrant.[5] J.D.D. was then booked into the Washington Parish Jail.[6]

On July 27, 2012, J.D.D. was transported to the St. Tammany Parish Jail, where he remained until July 31, 2012.[7] Plaintiff has alleged that J.D.D.'s treatment while at the jail violated his civil rights. In J.D.D.'s affidavit, he states that "on several occasions [he] was removed from the rest of the general population of inmates and put into a small (3 ft. by 3 ft.)

---

[4]     R. Doc. 1 at 4.

[5]     *Id.* at 5-7.

[6]     *Id.* at 7.

[7]     R. Doc. 73-2 at 1.

2

booking cage or 'squirrel cage' for a minimum of several hours each time."[8] During the remainder of the time J.D.D. was in the jail, he was in a "larger holding cell" with other inmates.[9] In that cell was a telephone that detainees could use to call family or friends; J.D.D. stated that he called his parents from the telephone "as often as [he] was able to."[10] According to J.D.D., on one occasion he was confined to a booking cell along with two other inmates "for several hours," and the resulting physical restriction caused him to suffer serious knee injuries.[11] He also claims that he was forced to wear tight-fitting jail clothes called "hot pants" that "exposed [his] private parts."[12] Finally, J.D.D. states that he was denied his prescription ADHD medication during his incarceration and suffered withdrawal symptoms and mental distress as a result.[13] According to plaintiff, she tried to give J.D.D.'s medication to jail officials, but they refused to accept it.[14] Plaintiff also stated that she received a call from another inmate, Kent Burrows, who told her "that J.D.D had

_____

[8]     *Id.* at 1-2.

[9]     *Id.* at 2.

[10]     *Id.*

[11]     *Id.* at 3.

[12]     *Id.*

[13]     *Id.; see also* R. Doc. 58-3 at 5 (initial booking form for J.D.D. listing "Dexedrine" as a medication he was taking at the time of his arrest).

[14]     R. Doc. 73-3 at 2.

asked him to call [her] to let [her] know that J.D.D. had been
put in a squirrel cage and would be unable to call [her] for some
time."[15]

The affidavit of Gregory Longino, warden of St. Tammany
Parish Jail, describes the nature of pretrial detention at the
jail. According to Longino, the jail has four adult male holding
cells designed to house pretrial detainees.[16] Longino avers that
he does not specifically recall J.D.D., but that "it is likely he
remained in holding because it was anticipated that he would be
bonding out."[17] With regard to the "squirrel cages," Longino
avers that in July 2012, the jail was using the 3' x 3' booking
cells to hold detainees "for brief periods of time while their
booking information was being processed and their personal
property (wallets, jewelry, etc.) [was] inventoried."[18] The time
a detainee would spend in the booking cell, according to Longino,
ranged from "about a half-an-hour to several hours at a time."[19]
He stated that "J.D.D. could have been, and very likely was,
briefly held in a booking cage" while jail officials processed
his booking information and inventoried his belongings.[20]

---

[15]   *Id.*

[16]   R. Doc. 58-4 at 4.

[17]   *Id.*

[18]   *Id.* at 5.

[19]   *Id.* at 6.

[20]   *Id.* at 5.

Sheriff Strain, for his part, has averred that he had no knowledge of any of the facts regarding J.D.D.'s arrest or incarceration at St. Tammany Parish Jail until this lawsuit was filed.[21] Plaintiff has presented no evidence tending to rebut this statement.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.

---

[21]    R. Doc. 58-5 at 2.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.; Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

## B.   Qualified Immunity

"[T]he qualified-immunity defense 'shield[s] [government agents] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (second and third alterations in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "If a party moves for summary judgment and asserts a defense of absolute or qualified immunity in good faith, the burden shifts to the other party to rebut it." *Disraeli v. Rotunda*, 489 F.3d 628, 631 (5th Cir. 2007) (citing *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 633–34 (5th Cir. 2000)). In order to do so, the plaintiff may not simply rely on allegations in the pleadings, but must produce competent summary judgment evidence raising a genuine issue of material fact. *Morales v. Boyd*, 304 F. App'x 315, 318 (5th Cir. 2008). Specifically, "[t]he plaintiff must identify in the record a factual basis for the conclusion '(1) that the defendant violated the plaintiff's constitutional rights and (2) that the violation was objectively unreasonable.'" *Id.* (quoting *Bolton v. City of Dallas, Tex.*, 472 F.3d 261, 265–66 (5th Cir. 2006)). The movant,

on the other hand, can support its motion by relying solely on the pleadings. *Disraeli*, 489 F.3d at 631.

## III. DISCUSSION

### A.   The Call Logs Attached to Longino's Affidavit

At the outset, the Court resolves a dispute over the logs purporting to reflect the telephone calls plaintiff made from the jail's holding cell while he was confined there. Longino avers that "[i]n the four days that J.D.D. was held at the Jail, he made a total of at least 69 telephone calls from the holding cell."[22] Defendant has attached a "summary of the dates and times of those calls" to that affidavit.[23] Defendant argues that these call logs conclusively show that J.D.D. did not in fact spend any significant time in one of the booking cells because "he would have had to have been put in the booking cage, then taken out and put in a holding cell long enough to make one of his 66 or so phone calls and then returned to the booking cage, only to be removed again to a holding cell a few minutes or hours later so as to place another one of the phone calls."[24]

Plaintiff responds that these call logs are unreliable because they are unverified and "materially wrong."[25]  Moreover,

---

[22]    R. Doc. 58-4 at 5.

[23]    *See* R. Doc. 58-6.

[24]    R. Doc. 58-2 at 12.

[25]    R. Doc. 73-1 at 5.

plaintiff notes that the logs show several gaps of several hours in between calls, which is consistent with J.D.D.'s statement that he was put in a booking cell for several hours at a time.

The Court finds that both these arguments have merit. First, the call logs are inconsistent with the content of the call recordings that defendant has submitted to the Court. For example, the recordings contain several calls to the number 985-294-4901 that are not listed on the call log.[26] In light of this and other discrepancies, the Court is not satisfied that the call logs are an accurate summary of the telephone calls J.D.D. made while in jail. *Cf*. Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). "Unauthenticated documents are improper as summary judgment evidence." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (citing *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991)). Accordingly, the Court will not consider the call logs in deciding this motion.

Moreover, even if the Court were to accept the call logs as reliable, plaintiff is correct that it is still possible that J.D.D. was kept in a booking cell for several hours in between phone calls. Defendant has presented sworn testimony that the

---

[26]     *Compare* R. Doc. 58-6 at 2 *with* R. Doc. 58 Ex. E.

9

jail has never had a practice of moving a prisoner back and forth between the holding cell and a booking cell, but J.D.D. has stated that he was in fact so moved. And "summary judgment is not a procedure for resolving a swearing contest." *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (citing *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991)). Accordingly, for purposes of this motion, the Court must accept plaintiff's version of events.

**B.   J.D.D.'s Failure to Exhaust Administrative Remedies**

The Court next addresses defendant's argument that J.D.D.'s suit must be dismissed because he did not comply with the exhaustion provision of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) . This argument is meritless. As plaintiff correctly points out, the PLRA applies only in suits filed by prisoners. *Janes v. Hernandez*, 215 F.3d 541, 543 (5th Cir. 2000). J.D.D. was not a prisoner when this complaint was filed, and thus the exhaustion requirement of the Act does not apply to him. *See id.; Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999) ("[L]itigants . . . who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements of this provision.").

## C.   Plaintiff's Claims Against Strain

Having resolved these preliminary matters, the Court can address the merits of plaintiff's contention that Strain subjected J.D.D. to unconstitutional conditions of confinement by (1) having him placed in a booking cell for long periods of time and (2) denying him adequate food, clothing, and medical care.[27] Plaintiff has sued the Sheriff in both his individual capacity and his official capacity. The Court finds plaintiff has not presented sufficient evidence to survive summary judgment on her claims that Strain is liable in either capacity for the wrongs allegedly suffered by J.D.D, because (1) there is no evidence that Strain was personally involved in J.D.D.'s treatment while at the jail; and (2) the only policy, custom, or practice of St. Tammany Parish to which J.D.D. was subjected -- the practice of placing pretrial detainees in booking cells upon their arrival at the jail -- is not a constitutional violation. Even assuming that J.D.D.'s account of his treatment at the jail is accurate, plaintiff has presented no evidence that St. Tammany had a *policy or practice* of repeatedly placing detainees in a booking cell for long periods of time or withholding food, clothing, or medical care from detainees.

---

[27]     R. Doc. 1 at 9-12, 20-21; *see also* R. Doc. 73-2 (affidavit of J.D.D.).

1.   *Individual Capacity Standard*

A plaintiff suing a governmental official in his individual capacity "must allege specific conduct giving rise to a constitutional violation." *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). "It is not enough to allege that government officials with no direct contact with a plaintiff are responsible for acts of their subordinates." *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior* . . . . [V]icarious liability is inapplicable to . . . § 1983 suits . . . ."). Instead, "[p]ersonal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (citing *Rizzo v. Goode*, 423 U.S. 262, 371-72 (1976)); *see also Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

2.   *Official Capacity Standard*

A suit against a government official in his official capacity is the same as a suit against the government entity of which the official is an agent, and victory in such a suit imposes liability on the entity that he represents. *See Burge v.*

*Parish of St. Tammany*, 187 F.3d 452, 468 (5th Cir. 1999) (quoting *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 785 n.2 (1997)). Here, that entity is St. Tammany Parish. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a parish is a "person" subject to suit under section 1983. *See id.* at 690. A local government entity may be sued "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent the official policy, inflicts the injury that the government as an entity is responsible for under § 1983." *Id.* at 694.

Municipal liability under section 1983 requires proof of three elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)). An "official policy" is defined as "a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [government entity] . . . or by an official to whom the [entity] ha[s] delegated policymaking authority," but it also encompasses "[a] persistent, widespread practice of . . . officials or employees which although not authorized by officially adopted and promulgated policy is so common and well-settled as to constitute a custom that fairly represents [the entity's] policy." *Cuzzo v.*

13

*Tangipahoa Parish Council*, 279 F.3d 273, 289 (5th Cir. 2002) (alterations in original). The "moving force" element means that the "plaintiff must show direct causation" -- that is, "that there was 'a direct causal link' between the policy and the violation." *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 580)).

    *3.   Analysis*

    *a.   Inadequate medical treatment and "hot pants"*

Even assuming the truth of every statement contained in plaintiff's affidavits, there is absolutely no evidence that Strain was personally involved in the decision to withhold J.D.D.'s ADHD medication from him or the decision to make him wear "hot pants." Indeed, Strain's uncontroverted affidavit reflects that Strain had no knowledge of the circumstances surrounding J.D.D.'s detention until plaintiff brought this lawsuit. There is also no evidence in the record that Strain, the jail, or the parish had an official policy or custom of withholding medication from pretrial detainees or forcing prisoners to wear uncomfortable, humiliating clothing. Accordingly, plaintiff's claims against Strain based on these alleged harms cannot succeed. *See Manton v. Strain*, Civil Action No. 09-0339, 2010 WL 4364552, at *7, 9 (E.D. La. Oct. 21, 2010) (plaintiff could not state a claim against Strain for unconstitutional conditions of confinement because "there [was]

14

no indication that Strain was personally involved in [plaintiff]'s alleged mistreatment," and because plaintiff had presented no evidence "related to policies or customs in the St. Tammany Parish jail").

    b.   *Confinement in a booking cell*

    Plaintiff has also presented no evidence that Strain was personally involved in the decision to place J.D.D. in a booking cell. But she contends that the jail's use of the booking cells "was a policy, procedure and custom maintained by the Sheriff, despite admonishments of 'constitutional deficiencies'" by the DOJ.[28] In support of this contention, she notes that, on July 12, 2012, after investigating the conditions of confinement in the St. Tammany Parish Jail, the U.S. Department of Justice issued a letter to the parish detailing certain constitutional deficiencies in the jail's treatment of prisoners.[29] The letter expresses the DOJ's conclusion "that conditions of confinement at St. Tammany violate the constitutional rights of prisoners" based on the following findings:

> •    St. Tammany fails to provide adequate medical health screenings and assessments, treatment, and medication management for its prisoners with mental illness. . . .
> •    St. Tammany provides grossly inadequate suicide prevention care. Prior to and during [the]

---

[28]    R. Doc. 73-1 at 2.

[29]    *See* R. Doc. 73-4.

15

> investigation, these practices included placing prisoners with mental illnesses in booking cages ("squirrel cages"). . . . [W]e routinely found instances where booking cages were used to house prisoners with suicidal ideation, regardless of other available housing options. . . .
>
> - Many of St. Tammany's Licensed Practical Nurses ("LPNs"), who are primarily responsible for conducting initial medical screenings and initial and periodic evaluations of suicidal prisoners, have not been trained to identify or treat suicidal prisoners.
> - St. Tammany fails to provide adequate suicide prevention training to Jail staff.
> - St. Tammany's quality assurance program, including the means by which it examines suicide prevention and the Jail's response to suicide attempts and completed suicides, is inadequate.[30]

Plaintiff contends that, because of this letter, defendant "cannot deny his awareness of squirrel cage confinement of inmates, and the manner [in which] the squirrel cages were used in his jail."[31] In other words, according to plaintiff, the DOJ letter shows (1) that the jail had a policy or practice of using booking cells; (2) that the policy is unconstitutional; and (3) that defendant knew of the policy and its constitutional infirmities.

The Court finds this argument unpersuasive. The DOJ letter addressed only St. Tammany's treatment of mentally ill prisoners. It attacked the constitutionality of using the booking cells "for housing prisoners with suicide ideation,"[32] *not* the

---

[30]    R. Doc. 73-4 at 1-3.

[31]    R. Doc. 73-1 at 20.

[32]    R. Doc. 73-4 at 1.

constitutionality of using them for holding temporary detainees. Plaintiff has never alleged that J.D.D. suffered harm based on the jail's failure to properly manage or treat symptoms of mental illness, and there is no evidence in the record to that effect. Thus, the policies of the jail concerning mentally ill prisoners -- specifically, the practice of placing suicidal prisoners in booking cells -- were not the "moving force" behind the constitutional violations allegedly suffered by J.D.D. *See James*, 577 F.3d at 617 (5th Cir. 2009) (in order for municipality to be liable in a section 1983 suit based on an official policy, "a plaintiff must show direct causation, i.e. that there was 'a direct causal link' between the policy and the violation" (quoting *Piotrowski*, 237 F.3d at 580)).

The DOJ letter's only relevance to this suit is that it suggests that Strain was aware that the St. Tammany Parish Jail had booking cells that were used to house temporary detainees like J.D.D. And indeed, Longino admitted in his affidavit that in July 2012 the jail routinely used booking cells to confine detainees while their booking information was processed and their belongings inventoried.[33] Thus, it is evident that the jail had in place a policy or practice of placing detainees in booking cells upon their arrival to the jail, and that J.D.D. was subjected to this policy. Since, as explained above, there is no

---

[33]    R. Doc. 58-4 at 5.

evidence that J.D.D. suffered harms flowing from any *other* policy or custom of the St. Tammany Parish Jail, any constitutional claim against Strain must rest on the premise that the use of the booking cells to hold pretrial detainees is, by itself, a constitutional violation. *See Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (noting that supervisory liability exists in section 1983 suits only when a supervisor "overt[ly]" and "personal[ly] participat[es] in the offensive act" or "implement[s] a policy so deficient that the 'policy itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation'" (alterations in original) (internal quotation marks omitted) (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir. 1985))). The Court now turns to the validity of that premise.

The Fifth Circuit has held that "when a pretrial detainee attacks general conditions, practices, rules, or restrictions of pretrial confinement," such as the policy at issue here, courts should determine the constitutionality of those conditions using the test enumerated by the Supreme Court in *Bell v. Wolfish*, 441 U.S. 520 (1979). *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 643 (5th Cir. 1996); *see also Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009) (plaintiff challenging "an explicit policy or restriction," or a "*de facto* policy, as evidenced by a pattern of acts or omission sufficiently extended or pervasive," must satisfy the *Bell* test (internal quotation marks omitted)). In

18

*Bell*, the Court explained that, "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." 441 U.S. at 535. Accordingly, pretrial detainees have a Fourteenth Amendment right to avoid "conditions [that] amount to punishment." *Id.*[34] The Court adopted the following test to determine whether a given practice amounts to improper punishment of a pretrial detainee:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

*Bell*, 441 U.S. at 539 (footnotes omitted) (citations omitted).

"[T]his test is deferential to jail rulemaking; it is in essence

---

[34]     The parties have relied on the Eighth Amendment in their arguments regarding whether J.D.D.'s conditions of confinement were constitutional, but the Eighth Amendment is not strictly applicable to this case. "[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Ingraham v. Wright*, 430 U.S. 651, 671-672, n.40. Thus, "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Id.* Where, as here, a pretrial detainee challenges the conditions of confinement, "the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment," *id.*, which "requires that a pretrial detainee not be punished," *Bell*, 41 U.S. at 535 n.16.

a rational basis test of the validity of jail rules." *Hare*, 74 F.3d at 646. If a challenged practice meets *Bell*'s "reasonable relationship" test, it will be upheld so long as it comports with other constitutional guarantees. *Bell*, 441 U.S. at 536-37; *see also Hare*, 74 F.3d at 639 (noting that the state owes both prisoners and pretrial detainees the duty to "provide for [their] basic human needs -- *e.g.*, food, clothing, shelter, medical care, and reasonable safety" (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989))). Put differently, "a detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights." *Shepherd*, 591 F.3d at 454.

The Court finds that St. Tammany Parish Jail's policy of using booking cells to house detainees while their booking information is processed is reasonably related to a legitimate penological goal. Undoubtedly, the jail must put detainees *somewhere* when they first arrive at the facility, while their belongings are inventoried and their booking information processed. Accordingly, the Court finds that the use of booking cells meets the deferential test set forth in *Bell*. *Cf. Collins v. Ainsworth*, 382 F.3d 529, 546 (5th Cir. 2004) (finding that jail officials' "inability to get judges out to the jail late on Sunday to post bond" and "bad weather conditions" were

"legitimate, practical concerns" that sufficiently justified the overcrowding of the jail under *Bell*).

Moreover, the policy does not unconstitutionally deprive the detainees of basic human needs. Although remaining in a nine-square-foot booking cell is likely not comfortable, plaintiff has not shown that it subjects detainees to "genuine privations and hardship over an extended period of time," *Bell*, 441 U.S. at 542, or a deprivation of "basic human needs," *Hare*, 74 F.3d at 650. This is true for two primary reasons.

First, according to Longino's affidavit, detainees were held in booking cells for only a few hours.[35] While J.D.D. claims to have been left in a booking cell for several hours on many different occasions, plaintiff has presented no evidence that the jail had a policy or practice of using the booking cells in such a manner. *See Thompkins*, 828 F.2d at 305 (noting that a sheriff "cannot be held liable on the theory that he implemented an unconstitutional policy" when the plaintiff's only evidence is "that the system may have failed in the one particular instance" of which the plaintiff complains). The short length of time detainees generally spent in booking cells militates against a finding that the practice in question is unconstitutional. *See Hutto v. Finney*, 437 U.S. 678, 686-87 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement

---

[35]   R. Doc. 58-4 at 6.

meets constitutional standards. A filthy, overcrowded cell and a diet of 'gruel' might be tolerable for a few days and intolerably cruel for weeks or months."); *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) (noting that "the length of time a prisoner is subjected to harsh conditions is a critical factor in [the] analysis"); *cf. Payton v. Gusman*, Civil Action No. 12-2578, 2013 WL 5530280, at *6 (E.D. La. Oct. 7, 2013) ("Short-term sanitation problems, although admittedly unpleasant, do not amount to constitutional violations." (collecting cases)).

Second, while the booking cells are undoubtedly small, plaintiff has presented no evidence that their use resulted in "unsanitary or unsuitable conditions amounting to punishment," *Collins*, 382 F.3d at 545. *Cf. Davis v. Scott*, 157 F.3d 1003, 1004-06 (5th Cir. 1998) (inmate confined for three days in a "crisis management cell" that was "'just filthy,' with 'blood on the walls and excretion on the floors and bread loaf on the floor'" had not suffered a "sufficiently extreme deprivation" to state an Eighth Amendment claim); *Hamilton v. Lyons*, 74 F.3d 99, 106 (5th Cir. 1996) (pretrial detainee "denied visitation, telephone access, recreation, mail, legal materials, sheets, and showers for a three-day period" could not show a constitutional violation); *Smith v. Copeland*, 87 F.3d at 269 (pretrial detainee who had to "endure the stench of [his] own feces and urine' for . . . four days" because of an overflowed toilet in his cell had not suffered a constitutional violation). The Court finds that

22

confinement in the booking cells for a few hours is significantly less onerous than the conditions detailed in *Davis*, *Hamilton*, and *Smith*. (Again, plaintiff presents evidence that J.D.D. himself was placed in a booking cell with two other individuals on one occasion, but that evidence, even if accurate, does not establish that the jail had a *policy* of overfilling the booking cells, or that any such policy resulted in unsafe or unsuitable conditions for many prisoners. *Cf. Thompkins*, 828 F.2d at 305.)

The cases in which courts have found Eighth or Fourteenth Amendment violations based on jail conditions have involved deprivations significantly more severe than those at issue here. *See Sheperd*, 591 F.3d 445 (plaintiff who demonstrated that jail routinely failed to diagnose, monitor, and treat patients with chronic illnesses and failed to give over half of the inmates their prescription medication had shown that conditions of confinement amounted to punishment in violation of *Bell*); *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004) (placement in "cells [that] were 'extremely filthy' with crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles on the walls" was unconstitutional because "living in such conditions would present a substantial risk of serious harm to the inmates"); *McCord v. Maggio*, 927 F.2d 844, 846 (5th Cir. 1991) (plaintiff forced to live and sleep for an extended period in a cell filled with sewage and foul water had been subjected to cruel and unusual punishment). Plaintiff has simply failed to

present evidence that St. Tammany Parish Jail's practice of using booking cells deprived pretrial detainees of the basic necessities of life in a manner similar to the practices described in the foregoing cases.

**IV.   CONCLUSION**

In sum, the Court concludes that defendant is not liable for any of the harms allegedly suffered by J.D.D. because the evidence shows that (1) defendant was not personally involved in any aspect of the arrest or incarceration of J.D.D. and (2) the only policy, practice or custom of the jail to which J.D.D. was subjected is not unconstitutional. Accordingly, the Court GRANTS defendant's motion for summary judgment.

New Orleans, Louisiana, this 28th day of February, 2014.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE